[No. 31627-3-I.   Division One.   December 27, 1993.]

FREDERICK A. OLMSTED, ET AL, *Respondents,* v. ABEL K. MULDER, *Defendant,* ALVIN J. MULDER, *Appellant.*

---

170

*Charles E. Welsh,* for appellant.

*John A. Follis* and *Law Office of Anderson Hunter,* for respondents.

SCHOLFIELD, J. — Frederick and Rhonda Olmsted brought this suit against Abel Mulder and Alvin Mulder for breach of contract, constructive fraud, and misrepresentation in connection with their purchase of real property from the Mulders. From a judgment in favor of the Olmsteds, Alvin Mulder appeals. We affirm.

On July 13, 1988, Fred and Rhonda Olmsted signed a real estate purchase and sale agreement to purchase the home and property located at 8914 160th N.E., Arlington, Snohomish County, Washington. The 5-acre parcel, owned by Abel K. Mulder, consisted of a 900-square-foot home with a garage and barn. Although the house was generally in a run-down condition, Fred Olmsted believed he could do much of the needed repair work himself.

Abel Mulder signed and accepted the agreement on July 16, 1988. The purchase price was $65,000, and the Olmsteds agreed to pay $12,000 down and issue Mulder a promissory note and deed of trust to secure the remaining $53,000.

At the time the transaction occurred, Abel Mulder was in a nursing home. Abel's son, Alvin J. Mulder, assisted his father

in completing the transaction. Alvin listed the property with Rita Artis of Arlington Properties, and signed the listing agreement himself. Alvin conceded he acted as his father's agent in completing the transaction. When Abel Mulder later died, Alvin Mulder became his successor in interest to the promissory note and deed of trust connected with the property.

A few months prior to the sale, Alvin Mulder rented the home to Steve Tarquinio and his family. Mulder agreed to allow the Tarquinios to live in the house for about 2 months rent free in exchange for doing repair work on the premises. While living in the house, Tarquinio's wife became ill, and Tarquinio had a test done on the water. Tarquinio stated that the test results indicated the water was not satisfactory, and that he informed Alvin Mulder over the phone that they were moving out because the water was unacceptable to drink. Tarquinio did not show Mulder a copy of the test.

Alvin Mulder admitted that Tarquinio told him that he "suspected" the water was contaminated. However, Mulder took no steps to investigate whether the water was contaminated prior to selling the property to the Olmsteds. Before closing the sale, Mulder filled out a Form 17 "Single Family Residence Property Information Form", where he indicated that to the best of his knowledge the well provided an adequate year-round supply of water. Olmsted reviewed this document prior to closing and stated that he relied on it in deciding to close the sale.

With the approval of the Mulders, the listing agent, Rita Artis, had inserted an "as is" clause in an addendum to the purchase and sale agreement. The agreement, however, lists another agent from Arlington Properties, Donna Mae Schultz, as the seller's agent. Fred Olmsted testified that Schultz briefly discussed the "as is" clause with him:

A: She mentioned that on that line, buyer to accept property as-is pretty much said that the house needs some repairs. And her indication was towards the condition of the house.

Q: Well, try to remember as specifically as you can. Do you remember exactly what she said?

A: Well, there was no big discussion about it. There was no debate over what it is and what does it mean.
Q: Did she make a reference to the house being old when she wrote that in?
A: Basically, yes.
Q: What was your understanding of what as-is meant?
. . . .
A: I thought it was the condition of the house, the roof, the dry rot in the house.

The "as is" clause appears as a handwritten addendum and simply says, "Buyers to accept property as is." Exhibit 5. It does not specifically disclaim any of the preprinted warranties, and none of these warranties are crossed out. In paragraphs 26 and 27 of the agreement, Mulder warranted that the septic system was in good working order and needed no repairs, that the system met all governmental health and construction standards, and that the well had always provided an adequate supply of household and yard water meeting Department of Social and Health Services purity standards.

The Olmsteds moved into the house in early August 1988. About 2 days later, the well went dry. Fred Olmsted also began to notice problems with the septic system that winter. The toilets in the home backed up and could at times be flushed only twice per week. The property flooded the first winter as well. Mulder concedes the water was contaminated at the time of sale.

The Olmsteds made irregular payments on the promissory note between 1988 and 1990. Fred Olmsted stated that Alvin Mulder allowed him to do this so that he could make the necessary repairs on the house. It was not until 1990 that the Olmsteds had the water tested and discovered it was contaminated. In May 1990, Peter Jorgenson of the Snohomish County Health District received a complaint about the Olmsteds' property. Jorgenson visited the premises and concluded the septic system was a public health hazard and that it needed to be replaced.

In October 1990, the Olmsteds filed this suit against Abel K. Mulder, Alvin Mulder, and Arlington Properties, seeking

damages for breach of contract, constructive fraud, and misrepresentation. Alvin Mulder, as successor in interest on the note and deed of trust, counterclaimed for the balance owing on the note. Mulder also brought an action against Arlington Properties, which is to be tried separately.

During the August 1992 bench trial, the Olmsteds called numerous expert witnesses to provide evidence in support of their claims. As previously indicated, Peter Jorgenson of the Snohomish County Health District had told the Olmsteds that their septic system needed to be replaced. By deposition, certified septic system designer Craig Anderson testified that he designed a septic system for the Olmsteds. Unlike the existing system, the new system was designed to be placed in the backyard because the front yard was too wet, there was not enough room in front, and the current system was too close to the well. Anderson indicated that former WAC 248-96-100 required the septic tank to be a minimum of 50 feet from the well. The septic system did not meet applicable codes as they existed in 1988. Anderson charged the Olmsteds $750 for the design.

Edgar Colebourn, chief appraiser for the Snohomish County Assessor's Office, testified that the assessed value of the Olmsted property in March 1989 was $62,500: $29,100 for improvements (*i.e.*, the barn and the house) and $33,400 for the land. This assumed a properly functioning well and septic system.

Jacob VanPutten, a septic tank installer, testified that he installed a septic tank system at the Olmsted residence. VanPutten charged the Olmsteds $7,296.75 to install the system. He recommended that, due to flooding problems on the property, a new drainage system needed to be installed. Without the new drainage system, VanPutten testified that the new septic system he installed would malfunction.

William Miller testified that he worked at a company specializing in drainage contracting. Miller designed a system to dewater the Olmsted property. The original bid was $11,240, which was subsequently reduced to $5,150 on the

assumption that the homeowner would perform as much work as possible, such as digging and remedial regrading.

Gordon Hanks testified that he was in the water well drilling business. Fred Olmsted asked Hanks to prepare a bid on a water well. Hanks estimated that it would cost $4,075 to construct a new well.

At the close of the evidence, the trial court ruled in the Olmsteds' favor. The court ruled the "as is" clause in the purchase and sale agreement was not bargained for and therefore would not be given effect. The trial court also ruled that the seller, Abel Mulder, had a duty to disclose the concealed defects on the property to the Olmsteds. The court found that Mulder had knowledge of the defects, that the defects were dangerous to the buyers' life or health, that a reasonable inspection would not disclose the defects, and that the value of the property was adversely affected.

The court ruled that the correct measure of damages was the cost of cure or the decrease in market value, whichever was less. The court found that the cost of cure, $18,421.75, was less than the decrease in market value of $20,000 to $25,000. Exercising its equity powers, the court granted the Olmsteds an offset against the remaining balance of the promissory note in the amount of $27,585.15, which was the total of the cost of cure plus prejudgment interest.[1] As of October 1, 1992, principal and interest on the note totaled $65,789.20; when reduced by the offset, the amount remaining is $38,204.05.

The court also granted the Olmsteds $14,682 in costs and attorney fees pursuant to an attorney fee clause in the purchase and sale agreement.

In this appeal, Alvin Mulder's primary claims are that (1) the "as is" provision in the agreement was effective to disclaim the preprinted warranties in the agreement, (2) there was insufficient evidence to show that Abel Mulder had knowledge of the concealed defects in the well and septic

---

[1]Because Mulder did not object to the award of prejudgment interest at trial or on appeal, we do not address the propriety of prejudgment interest.

system, and (3) the proper measure of damages is not the cost of new systems.

## "As Is" Clause

Mulder claims the "as is" provision was bargained for by the parties and was effective to disclaim the preprinted warranties. He claims the provision is not rendered invalid by the purchasers' subjective belief that it applied only to the building. Mulder argues that the handwritten "as is" clause is not ambiguous and prevails over the boilerplate, fine print warranties on the back of the agreement form. He claims that the trial court erroneously undertook to interpret the "as is" clause and further erred in construing the clause against the seller. Mulder claims Schultz was not the seller's agent.

An "as is" clause generally means that the buyer is purchasing property in its present state or condition. *See Jaffe v. Bolton*, 817 S.W.2d 19, 25 (Tenn. Ct. App. 1991); *Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Sav. Bank*, 117 Ill. App. 3d 284, 292, 452 N.E.2d 1361, 1367 (1983). The term implies that the property is taken with whatever faults it may possess and that the seller or lessor is released of any obligation to reimburse the purchaser for losses or damages that result from the condition of the property. *See Jaffe*, at 25.

To the extent an "as is" clause negates express or implied warranties, it operates as a disclaimer and is not favored in the law. *See Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.*, 28 Wn. App. 539, 541-42, 625 P.2d 171 (1981). Therefore, the courts have added two conditions for effectiveness: (1) a disclaimer must be explicitly negotiated or bargained for, and (2) it must set forth with particularity the qualities and characteristics being disclaimed. *Hartwig Farms*, at 542.

There is not a wealth of authority on the "bargained for" requirement. Normally, this requirement is applied

> to avoid giving effect to a seller's disclaimer of express or implied warranties where that disclaimer is in a contract prepared by the seller and contained in fine print or boilerplate. The seller has the burden of demonstrating that such a dis-

claimer was known to the buyer and bargained for before it will be considered valid and given effect.

(Footnote omitted.) *Lyall v. DeYoung*, 42 Wn. App. 252, 257, 711 P.2d 356 (1985), *review denied*, 105 Wn.2d 1009 (1986). The "as is" clause in this case was certainly known to the Olmsteds. Fred Olmsted testified that he discussed the provision with agent Donna Mae Schultz. This was sufficient to satisfy the "bargained for" requirement.

However, we conclude the "as is" clause fails the second requirement of *Hartwig Farms* because it fails to set forth with particularity the qualities and characteristics being disclaimed. Although Mulder urges the court to find that the written "as is" clause prevails over any conflicting printed clauses, his argument misses the point. Because the clause is silent as to what is being disclaimed, it does not expressly conflict with any printed clause.

Although the Uniform Commercial Code is not directly applicable to the sale of real estate,[2] U.C.C. Article 2 provides us with some guidance on disclaimers of warranties. RCW 62A.2-316(3)(a) states that

> unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; . . .

This provision does not address the effect of an "as is" clause on *express* warranties such as those present in this case. However, RCW 62A.2-316(1) states:

> Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (RCW 62A.2-202) negation or limitation is inoperative to the extent that such construction is unreasonable.

Official Comment 1 to this provision sheds light on its purpose:

> This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude "all war-

---

[2]*See Schoeneweis v. Herrin*, 110 Ill. App. 3d 800, 805, 443 N.E.2d 36, 40 (1982).

ranties, express or implied." It seeks to protect a buyer from unexpected and unbargained language of disclaimer by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which protect the buyer from surprise.

Official Comment 1, RCWA 62A.2-316.

We believe the reasoning of the U.C.C. on the disclaimer of warranties is persuasive and can be applied by analogy in this case. *See* 1 Washington State Bar Ass'n, *Commercial Law Deskbook* § 3.2(3), at 3-4 to 3-5 (1987). We interpret the "as is" clause to be consistent with the express warranties relating to the sewer system and well. It makes no reference to these express warranties, and it therefore cannot be fairly read as disclaiming them.[3] The clause fails because it does not state with particularity the items being disclaimed. Although the trial court found the clause invalid for a different reason, we may affirm the trial court on any theory within the pleadings and the evidence, even if the trial court did not consider it. *In re Marriage of Foran*, 67 Wn. App. 242, 248, 834 P.2d 1081 (1992). Our decision on this issue makes it unnecessary to address whether Abel Mulder knew of the concealed defects in the well and septic systems.

Alvin Mulder next disputes the trial court's finding that Abel[4] breached his duty to disclose defects with the drainage system, arguing that these facts were disclosed to the purchasers. The court awarded the Olmsteds $5,150 for the cost of a new drainage system.

In filling out the Form 17 statement, Mulder checked "Yes" on a question regarding whether there was any stand-

---

[3]*See Hartwig Farms*, at 542; *Limited Flying Club, Inc. v. Wood*, 632 F.2d 51, 57 (8th Cir. 1980) (applying U.C.C. and ruling that where "as is" disclaimer did not address written express warranties contained in airplane logbook — including warranty of airworthiness — "as is" clause construed to disclaim only implied warranties, leaving express warranties intact).

[4]The trial court found that Abel Mulder failed to disclose drainage system problems. However, it was Alvin Mulder, acting on Abel's behalf, who actually filled out and signed the Form 17 statement.

ing water or drainage problems on the property. Exhibit 6. Mulder also told Olmsted that the property would get wet and marshy toward the back. However, Olmsted testified that Alvin Mulder pointed out a ditch to him and said that in the winter it would handle any rainwater or runoff. In response to a question on Form 17 asking whether he had done anything to correct the standing water or drainage problem, Mulder gave the following incomplete answer: "Drain ditchs [sic] have been . . .". Exhibit 6.

■ We believe that Olmsted's testimony, together with Mulder's response on Form 17, provides substantial evidence that defects in the drainage system were not adequately disclosed. We decline to disturb the trial court's finding on this issue.

Mulder also claims that the trial court erred in finding that the well did not comply with land requirements in effect in 1988 because it was too close to the septic system and subject to drainage problems. Mulder argues that such matters are irrelevant to a well and septic system built before the adoption of the regulations.

Mulder's liability is predicated on his clear breach of the warranty pertaining to the well. At the time of sale, Mulder warranted to the Olmsteds that the well "has always provided an adequate supply of household and yard water, meeting State Department of Social and Health Services purity standards . . .". Exhibit 5 (clause 26). Mulder concedes in this appeal that the water was contaminated at the time of sale. The issue of compliance with land requirements is immaterial insofar as the well is concerned.

As for the septic system, Mulder warranted that

the septic system serving the property: (a) is in good working order and Seller has no knowledge of any needed repairs; and (b) Meets all applicable Governmental, health, construction and other standards.

Exhibit 5 (clause 27). The warranty of the septic system specifically states that the system "[m]eets all applicable Governmental, health, construction and other standards."

We believe this includes any land regulations in effect in 1988.

## DAMAGES

Mulder claims the proper measure of damages is not the cost of new systems. He claims that the purchasers' benefit of the bargain does not include the cost to install new, state-of-the-art systems. Mulder argues that the trial court had no legal basis to exercise its equity powers to offset the damage award against the remaining balance of the note.

The Olmsteds claim they are entitled to the cost of cure. They claim the cost of cure was less than the decrease in market value. They claim the cost of cure should be deducted from the principal balance owed on the promissory note.

In *Lyall v. DeYoung*, 42 Wn. App. 252, 258-60, 711 P.2d 356 (1985), *review denied*, 105 Wn.2d 1009 (1986), this court discussed the proper measure of damages in the context of a residential home seller's breach of an express warranty regarding water quality.

> The buyers are entitled to their benefit of the bargain: the difference in the market value of the property as warranted on the date of sale and its actual value on that date with the defect, along with any consequential damages not inherent in the benefit of the bargain should that measure fail to make the buyers whole. . . .
> Although the buyers put on evidence of the cost of curing the defect as a possible measure of damages, the cases which permit damages based on cure (including extremely expensive cures relative to the contract price) all involve performance contracts for construction rather than contracts for sale, and thus do not control here. *See Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 39-49, 686 P.2d 465 (1984). . . . While *Eastlake* does not control this case since we have a contract for the sale of real property before us, it continues and encourages the principle of awarding the least costly remedy whether that be cure or benefit of the bargain plus any proper consequentials. *See also* 5 A. Corbin, *Contracts* § 1090, at 496-97 (1964), to the effect that where the damages under cure and benefit of the bargain analyses are different, courts tend to award the lesser amount. Under this rationale, if the seller can establish on remand that the cost of a cure is less than the benefit of the bargain measure, the cost of cure would be the proper measure of damages.

(Footnotes omitted.) *Lyall*, at 259-60. The reasoning of *Lyall* supports the use of the cost of cure as a measure of damages where such cost is less than benefit of the bargain damages.

The cost of cure in this case was calculated at $18,421.75. This figure included $4,075 for a newly relocated well; $1,150 to abandon the old well; $750 to design and relocate the new septic system; $7,296.75 to build a new septic system, and $5,150 for a new drain system.

The court found that the difference between the property as represented and its actual value was between $20,000 and $25,000. The court based this determination on the testimony of two plaintiffs' witnesses: Edgar Colebourn, chief appraiser for the Snohomish County Assessor's Office, and Raymond Little, a real estate agent.

The Olmsteds purchased the property in August 1988 for $65,000. Colebourn testified that the appraised value of the Olmsted property in March 1989 was $62,500: $29,100 for the improvements and $33,400 for the land. This figure assumed a functioning well and septic system.

Little testified that he conducted a market analysis of the property in July 1988. He estimated that at that time, the land was worth $28,000. He further testified that the home, assuming a working well and septic, was worth $15,000. However, he also stated he had no reason to disagree with Colebourn's estimate that the value of the property, assuming a functioning well and septic, would have been between the 1986 assessed value ($46,700) and the 1989 value ($62,500). Little testified that "[i]t would be a number in between that." When asked if a small home without a functioning well or septic system would have any market value, Little replied that it would "[b]e pretty tough to sell it".

Olmsted argues it is reasonable to infer that, with all the latent defects, the fair market value of the property was not more than the raw value of the land, which was $33,400 in 1989. We believe the $20,000 to $25,000 figure used by the trial court is a reasonable estimate of the difference between the value of the property as represented and its actual value.

Mulder next contends the trial court had no legal basis to offset the damage award against the remaining balance on the note. His challenge is to the following conclusion of law:

> The Court, in exercising its equity powers grants the plaintiffs an offset on the remaining balance on the promissory note for $18,421.75 plus prejudgment interest from the date of sale for a total offset of $27,585.15. The principal amount due on the promissory note as of October 1, 1992 including interest was $65,789.20. Reduced by the amount of the offset the balance remaining on the promissory note is $38,204.05.

(Footnote omitted.) Conclusion of law 5. Mulder claims the Olmsteds were in arrears in the amount of $17,291.16 as of the time of trial.[5] Mulder claims that this amount should have been offset against the $18,421.75 award to the Olmsteds (a figure which excludes prejudgment interest) so that the total award to the Olmsteds would have been only $1,130.59. Mulder claims this "legal" remedy was available, making the "equitable" remedy applied by the court unnecessary. Brief of Appellant, at 49.

■ We find nothing in the record to indicate that the court awarded Mulder a judgment for the delinquent note balance. In any case, the setoff of judgments is generally no different from the setoff of claims not reduced to judgments. *See* 47 Am. Jur. 2d *Judgments* § 1002, at 97 (1969). The determination of whether to set off one judgment against another rests within the discretion of a court exercising equity powers. *See Spokane Sec. Fin. Co. v. Bevan*, 172 Wash. 418, 421-22, 20 P.2d 31 (1933). Mulder has presented no authority that the court here abused its discretion or improperly exercised equity powers.

Finally, Mulder claims that the trial court should have reduced the prejudgment interest awarded the Olmsteds "by an amount equal to the non-scheduled interest accrued on the promissory note due to the plaintiffs' failure to make payments." Brief of Appellant, at 48. Mulder also suggests

---

[5]The case was tried August 31 through September 1, 1991. The trial court found that as of May 12, 1990, the principal balance on the note was $52,807.19. Interest accrued on the debt from May 12, 1990, to October 1, 1992, totaled $12,982.01.

that the trial court should have offset the judgment in the Olmsteds' favor against a higher note balance, $70,098.35.

We cannot determine from the record whether Mulder ever raised these claims below, and there is nothing to indicate the trial court ever addressed them. The party seeking review has the burden of perfecting the record so that this court has before it all of the evidence relevant to the issue. *Allemeier v. UW*, 42 Wn. App. 465, 472, 712 P.2d 306 (1985), *review denied*, 105 Wn.2d 1014 (1986). We cannot reach the merits of Mulder's arguments because he has failed to provide us with a sufficient trial record.

ATTORNEY FEES AT TRIAL AND ON APPEAL

The Olmsteds substantially prevailed at trial and were properly awarded attorney fees at trial pursuant to clause 18 of the real estate purchase and sale agreement. They are also entitled to an award of fees on appeal. Mulder's request for attorney fees on appeal is denied.

Judgment affirmed.

WEBSTER, C.J., and GROSSE, J., concur.

Reconsideration denied January 24, 1994.

Review denied at 123 Wn.2d 1025 (1994).