**Cornelia F. ROSS, et al., Appellants,**

v.

**HACIENDA COOPERATIVE, INC., Appellee.**

No. 94–CV–803.

District of Columbia Court of Appeals.

Argued Sept. 7, 1995.
Decided Nov. 27, 1996.

Richard W. Luchs, Washington, DC, with whom David P. Blackwood and Lauren C. Mullen, Washington, DC, were on the brief, for appellants.

Michael J. Goergen, Washington, DC, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

REID, Associate Judge:

This case concerns a dispute as to whether the seller or buyer should properly be awarded a refund of tax assessment monies originally paid to the District of Columbia for repair of roofs on a five building apartment complex in Southeast Washington. The District repaired the roofs after the seller failed to do so, and assessed the cost to the purchaser. However, the purchaser had to install new roofs because the District's repairs were faulty. An addendum to the sales contract specified that the Property was to be sold "as is," but, pursuant to a supplemental agreement, the seller placed part of the purchase price, $80,000, in escrow to cover the District's assessment or the cost of roof repair.

The buyer sued the seller on both equitable and legal claims; however the relief sought on both the equitable and legal claims involved a sum of money for the roof repair. At the conclusion of a bench trial, the trial court imposed a constructive trust on the tax assessment refund and ordered it to be paid to the buyer, even though the court ruled against the buyer on its legal claims. The seller contends that the trial court committed error in imposing a constructive trust after dismissing the buyer's legal claims, and that the tax refund properly belongs to the seller. We remand the case to the trial court for additional factual findings.

## I. FACTUAL BACKGROUND

Appellants Cornelia F. Ross, *et al.* were joint venturers ("the Joint Venturers") in a real estate undertaking known as the Hacienda Joint Venture ("the Joint Venture"). The Joint Venture owned the Hacienda Apartments, a five building complex in Southeast Washington ("the Property"). On January 31, 1989, the Hacienda Tenant Association, Inc. ("the Tenant Association") entered into a contract for the purchase of the Property from the Joint Venture for the sum of $795,-000.00. A February 13, 1989, Addendum to the Sales Contract specified that it would be sold in an "as is" condition.

On October 10, 1989, the Hacienda Cooperative, Inc. ("Hacienda") was incorporated in Delaware for the purpose of acquiring, owning and operating property as a limited equity housing cooperative in the District of Columbia. Hacienda succeeded the Tenant Association as purchaser of the Property un-

der the January 31, 1989, sales contract and the February 13, 1989, addendum.[1] Closing on the Property took place between November 13 and December 1, 1989.[2] During the closing period, as indicated below, the parties executed a supplemental agreement under which the Joint Venturers placed $80,000 in escrow to cover the cost of the roof repair.

Prior to the sale of the Property, tenants had complained about leaking roofs and other problems. On February 2, 1987, a petition in behalf of seven tenants, *George P. Jackson, et al. v. Vijon Realty*, TP 20, 810, was filed with the Rental Accommodations and Conversion Division of the Department of Consumer and Regulatory Affairs ("DCRA"). The petition is not part of the record, but there was testimony at trial that the petition concerned complaints about a substantial reduction of services to the facilities and a request for a rent rollback.[3]

DCRA issued a housing deficiency notice in February 1988, which specified that the roofs of the entire apartment complex were in substandard condition and in violation of the District's housing regulations.[4] The Joint Venture did not abate the violation. In January 1989, DCRA asked the Department of Public Works ("DPW") to arrange for the necessary repairs to the roofs. On September 28, 1989, DCRA advised The Tenant Association that DPW had replaced the roofs on the five building complex at a cost of approximately $80,000 and that an assessment for payment would be made in October 1989.

In an undated "Escrow Agreement–Post Settlement," ("escrow agreement") the Joint Venturers set aside $82,000 of the Property's purchase price. One of the participants in the closing on the Property testified at trial that the post settlement escrow agreement was signed on November 13, 1989. Paragraph 1 of the escrow agreement provided in part that "[e]scrow agent shall hold in an interest bearing escrow account the total sum of $82,000 . . ., as reflected on Lines 516 and 517 of the Settlement Statement for the sale. . . ." Paragraph 516 of the Settlement Statement specified "roof repair escrow— $80,000." There was no reference to the District's assessment notice letter. The remaining $2,000, according to Paragraph 517 of the Settlement Statement, covered a "mechanics lien escrow."

On November 21, 1989, the Joint Venture and about twenty-seven tenants (individually and on behalf of the Tenant Association) executed a settlement and release agreement regarding one of the tenant petitions, TP 20, 810. The agreement provided that if the sale of the Property actually took place, the Joint Venture would pay to Hacienda $35,000 from the sale proceeds in consideration for the dismissal of the tenant petition.[5] The release covered claims "within the jurisdiction of the Rent Administrator to adjudicate." There was no specific mention of the roof problem.

Sometime after closing on the Property, Hacienda discovered that the District's roof repair work was faulty. On June 8, 1990, Hacienda asked the District to stop all work on the roofs. The District issued a special assessment notice on July 9, 1990, demanding $79,167.81 for replacing the roofs on the Property. After receiving a request from

---

1. On October 16, 1989, the Tenant Association authorized the incorporation of Hacienda "for the purpose of acquiring, owning and operating [the Property] . . . as a limited equity, low-yield housing cooperative for the benefit of its members." An October 24, 1989 Resolution of Hacienda recognized that it was the successor of the Tenant Association and had the authority to sign all acquisition documents for the Property.

2. The deed transferring title to Hacienda is dated November 13, 1989, but the effective date of the transfer is December 1, 1989.

3. Apparently a second tenant petition was filed in December 1987. That petition is not part of the record. A former president of the Tenant

Association testified at trial that the first tenant petition did not concern the condition of the roofs but that the second petition (TP 21, 130) did. The second petition is not mentioned in the trial court's findings of fact.

4. DCRA inspectors visited the Property on January 20 and 21, 1988 and confirmed the existence of roof leaks.

5. According to the testimony of Mr. Chester Speight, former president of the Tenant Association, the $35,000 was distributed to the tenants who signed the agreement. There is no indication in the record that any of the $35,000 was applied to the cost of the roof repair.

Hacienda that the assessment be paid, the escrow agent paid $79,167.81 to the District "under protest" and wrote, "[i]t is the intention of the former owner to challenge this special assessment."[6] Hacienda arranged for a replacement of all of the roofs and paid the sum of $125,576.25 between August and November 1990.

After the escrow agent paid the repair assessment to the District, the Joint Venturers filed a petition in the Tax Division of Superior Court in 1990 to recover the money paid. The Tax Division refused to permit Hacienda to intervene for the purpose of lodging a cross-claim against the Joint Venturers, but after ruling in favor of the Joint Venturers, the Tax Division ordered the $79,167.81 refund to be placed in an interest bearing escrow account pending the conclusion of a civil action brought by Hacienda in the Civil Division of the Superior Court.

**Hacienda's Complaint**

Hacienda filed a civil action against the Joint Venturers in 1992, seeking both equitable and legal relief. Count one of the complaint prayed for a declaratory judgment regarding entitlement to the tax refund. Count two requested imposition of a constructive trust on the tax refund to avoid unjust enrichment of the Joint Venturers. Counts three and four were claims for breach of contract and negligent waste.

**The Bench Trial**

During a two day bench trial in April 1994, three witnesses testified for Hacienda: Joseph Lewis, an employee of the Department of Consumer and Regulatory Affairs who described the District's involvement in the roof issue; Robert Gray, the general manager of the commercial roofing company hired by Hacienda to correct and replace the District's roof repair work; and Chester Speight, former president of the Tenant Association. One witness testified in behalf of the Joint Venturers, John D. Thompson, former co-manager of the Hacienda apartments and one of the Joint Venturers.

With regard to the contract documents, Mr. Speight testified that the "as is" addendum was executed because the Joint Venturers had a competing purchase offer that included an "as is" clause. He stated that the November 13, 1989, escrow agreement was signed because: "[a]t settlement, the settlement agent was made aware there was a pending lien, so we reduced the selling price of the building and put the money in escrow with this agreement ..." He also identified a September 28, 1989, letter in which the Department of Consumer and Regulatory Affairs had advised Hacienda's counsel that "the Department of Public Works has replaced the roofs on the five buildings at the complex ... at an approximate cost of $80,000." Mr. Speight also identified the settlement sheet used during closing on the Property, and indicated that Paragraph 516 reflected a "roof repair escrow, eighty thousand dollars." Mr. John Thompson, who signed the sales contract on behalf of the Joint Venturers, confirmed that the "as is" clause was added because of a competing offer that included the clause. During his testimony, he was not asked about the November 13, 1989, escrow agreement even though he was present during the closing on the Property.

With regard to the actual or proposed cost of the roof repair, the trial testimony reveals that the District assessed Hacienda $79,167.81 for its roof repair which later proved to be faulty, and that Hacienda paid Function Enterprises, Inc., $125,576.25 to correct and replace the work done by the District. Mr. Thompson testified that the Joint Venturers had accepted a proposal from Rice Commercial Roofing in March 1989, to do the roof repair for $39,750. However, the District informed the Joint Venturers that the District's preparatory work for the roof repair was already in progress and the Joint Venturers were too late in their efforts.[7]

**The Trial Court's Findings and Conclusions**

After a two day bench trial in 1994, the trial court made several factual findings re-

---

**6.** The additional $1,169.97 probably constituted penalty and interest.

**7.** Mr. Thompson stated that the time for the Joint Venturers to do the roof repair had not expired when the District undertook its preparatory steps; under the District's order to the Joint Venturers, three days remained.

garding the owners of the property, tenant complaints, the sale transaction, and the roof problem. The trial court also concluded that Hacienda had not proved its legal claims. There was no breach of contract because Hacienda had taken the Property in an "as is" condition, knew of the defective roofs prior to sale and had assumed the risks associated with the defects. Hence, after consummation of the sale, the Joint Venturers had no obligation to abate the substandard conditions. Significantly, the trial court made no finding as to whether the parties, by executing the November 13, 1989, escrow agreement, intended the escrow payment to be applied toward the roof repair in the event that the District was entitled neither to issue a notice of assessment for roof repair, nor to enforce a lien for repair costs. Moreover, the trial court made no factual finding as to the reasonable cost of the roof repair. Hacienda's negligent waste claim failed, the trial court concluded because, after seeking relief from the District, it asked the District to cease work on the Property.[8]

After ruling against Hacienda on its legal claims, the trial court entered judgment for Hacienda on its equitable claim. According to the trial court, "[t]he record suggested that both parties expected the defendants would bear the reasonable costs of the necessary repairs. The parties did not expect the costs to increase due to the poor quality of work performed at the plaintiff's request by the District of Columbia. Neither did the parties expect the assessment arising from such work to be abated in its entirety." Moreover, the trial court found that the Joint Venturers "violated the District of Columbia Housing Code and that the involvement of the District of Columbia was the direct result of the defendants' abandonment of their duties as landlords toward the plaintiff, as tenants. A refund to the defendants of the funds held in escrow would, in effect reward

the defendants for their neglectful actions in their prior role as the owners of the Hacienda Apartments, and [would] result in an unexpected windfall." Consequently, the trial court imposed a constructive trust to avoid unjust enrichment of the Joint Venturers. It limited Hacienda's recovery "to the amount both parties reasonably expected to be the cost of the needed repairs," and ordered the escrow sum of $79,167.81 plus accrued interest and post-judgment interest of five (5) percent to be paid over to Hacienda. The Joint Venturers duly noted an appeal.[9]

## II. Analysis

■ Under D.C.Code § 17–305 (1989 Repl.), we "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." The trial court's findings of fact "are reviewed deferentially under the 'clearly erroneous' standard." *Griffin v. United States*, 618 A.2d 114, 117 (1992). However, "[t]he trial court's legal conclusions ... are reviewed under the non-deferential *de novo* standard." *Id.* In this matter, we must determine whether the trial court's findings support the grant of judgment to Hacienda.

### A.

On appeal, the Joint Venturers insist that the imposition of a constructive trust on the tax refund unjustly enriches Hacienda because Hacienda contracted to take the Property in an "as is" condition, and because the sellers only agreed to pay the District's assessment for the roof repair. Hacienda argues that the parties contemplated that the Joint Venturers would bear the cost of repairing the roofs as indicated by the escrow agreement, and further, it would be inequitable for Hacienda to bear the full cost of

8. Hacienda alleged that the Joint Venturers failed to prevent damage to the Property by the District. The District was alleged to be "an unwanted interloper" whose faulty roof repairs decreased the Property's value. Since Hacienda had complained to the District and "invited" the District to make the repairs, the trial court found that the District was not "an unwanted interloper."

9. Hacienda did not appeal the trial judge's conclusions as to its legal claims, presumably because it prevailed on count two of its complaint which involved a request for the imposition of a constructive trust to avoid unjust enrichment.

$125,576.25 for the repairs, since the parties anticipated that the escrow fund would be used for the roof repair and did not anticipate the District's faulty repairs.

Hacienda relies on the November 13, 1989, escrow agreement under which $82,000 of the purchase price was set aside—$80,000 of which was designated for "roof repair." In agreeing to set aside this sum, Hacienda contends, the Joint Venturers clearly recognized that title to the Property would not pass to Hacienda without the repairs.[10]

The Joint Venturers argue that the tax refund properly belongs to them. They assert that the escrow agreement was designed only to cover an "assessment" and that "Defendants never obligated themselves to pay Plaintiff any amount in relation to the repair of the roof of the Hacienda Apartments." However, Paragraph one (1) of the post settlement escrow agreement provides that: "Escrow Agent shall hold in an interest bearing escrow account the total sum of $82,000 ('Escrow Amount'), as reflected on Lines 516 and 517 of the Settlement Statement for the sale of 28 58th Street, S.E. ('Property')...." Paragraph 516 of the Settlement Statement specifies: "Roof Repair Escrow [-] $80,000.00" and Paragraph 517 reads: "Mechanics Lien Escrow [-] $2,000.00."

### B.

■ Although the trial court attempted to deal comprehensively with the rather complex issues raised by this case, we believe that her findings are insufficient and, in some measure, potentially contradictory. On the one hand, the judge found that the Joint Venturers had failed to prove their claims at law because the Property was sold "as is." On the other hand, in the trial judge's opinion, "the record suggests that both parties expected that the defendants would bear the reasonable cost of necessary repairs." If the

quoted language regarding the parties' expectations was intended to constitute a finding as to the parties' intent in executing the November 13, 1989, escrow agreement, then there may be some tension between that finding and the trial judge's holding that there was no breach of contract.

The testimony on the subject is less than enlightening. Mr. Thompson, the witness for the Joint Venturers, did not testify regarding this matter. The testimony of Mr. Speight for Hacienda is ambiguous. Furthermore, although the record contains actual roof repair costs incurred by the District in the amount of $79,167.81 and by Hacienda in the amount of $125,576.25, as well as an estimated cost of $39,750 from a roofing company with which the Joint Venturers were prepared to contract, the trial court made no finding as to the "reasonable costs of necessary repairs."

■ The trial judge predicated her judgment in favor of Hacienda on a finding that the Joint Venturers were unjustly enriched. The imposition of a constructive trust is an equitable remedy. Although a trial judge has considerable discretion in applying the remedy, *Gray v. Gray,* 412 A.2d 1208, 1210 (D.C.1980), the determination whether the Joint Venturers were *unjustly* enriched requires some meaningful analysis of the reasonable expectations of the parties, as reflected in the agreements signed and the entire course of their dealings.

So far as we can discern from the record, the pertinent agreements in this case were negotiated by counsel for the parties at arm's length. If the parties did not agree, explicitly or implicitly, that the Joint Venturers were to bear the reasonable cost of repair, then the trial court cannot convert their agreement into something it was not by invoking an equitable remedy. If, on the other hand, the parties shared a reasonable expec-

10. The Joint Venturers also appear to suggest that the November 21, 1989, "Agreement of Settlement and Release" between the Joint Venture and the Tenant Association regarding the resolution of *George P. Jackson, et al. v. Vijon Realty,* TP 20, 810 settled the roof repair issue. TP 20, 810 was brought on behalf of seven tenants and, as the trial court recognized, could not be regarded as a settlement of the issue between Hacienda

and the Joint Venturers. TP 20, 810 resolved an issue between tenants and landlord, not an issue between buyers and sellers. Moreover, the settlement agreement made no mention of the roof conditions. In addition, TP 21,130, which specifically singled out the roof problems, was not obviously part of the settlement agreement. Neither of these tenant petitions was included in the record on appeal.

tation that the Joint Venturers were responsible for the reasonable cost of repair, then it was appropriate for the trial court to enter judgment accordingly, after determining the reasonable cost of repair.

For the foregoing reasons, we remand the case to the trial court for additional findings as to the reasonable expectations of the parties with respect to who should bear the cost of the roof repair. The trial court should also make findings with respect to the amount of such reasonable cost, and any related issues that may arise. The trial judge may, in her discretion, reopen the record for additional evidence.

*So ordered.*

WAGNER, Chief Judge, dissenting:

In my opinion, this court can resolve, without remand, the issue raised by appellants, Hacienda Joint Venture Partnership (Sellers), *i.e.,* whether the trial court erred in imposing a constructive trust on the tax refund on the basis that Hacienda Cooperative, Inc. (Purchaser), had failed to prove its legal claims. In my view, the record shows that the trial court erred in granting appellee, Hacienda, equitable relief because it had failed to establish its legal claims for breach of contract and negligence. Equity may intervene where the legal remedy is inadequate, not where the proof at trial is insufficient to sustain the asserted legal claims. *See Marshall v. District of Columbia,* 458 A.2d 28, 29–30 (D.C.1982) (citations omitted).

Following a bench trial, the trial court found on the facts and applicable law that appellee failed "to sustain its claims in law." It was on that basis that the trial court considered and granted the Purchaser's alternate request for equitable relief. In this ruling, the trial court erred. As this court stated in *Marshall:*

> [I]t is axiomatic that equity has no jurisdiction over a controversy for which there is a complete and adequate remedy at law. *Chavin v. H.H. Rosin & Co.,* 246 A.2d 921, 922 (Del.1968). Further, "[i]f it appears that the absence of a remedy at law is due to plaintiff's failure to pursue that remedy, then equity will not intervene and the complaint should be dismissed." *Smaldone v.*

*Kurtz,* 450 F.Supp. 1138, 1140 (D.D.C. 1980)[1978]; *Commissioner v. Shapiro,* 424 U.S. 614, 634 n. 15, 96 S.Ct. 1062, 1074 n. 15, 47 L.Ed.2d 278 (1976). Only when it has been impossible despite the plaintiff's best efforts to obtain a decision at law should plaintiff be permitted to overcome the anti-injunction bar and pursue the drastic alternative of equitable relief. *Id.*

458 A.2d at 29–30 (Second alteration in original).

### · The Remedy At Law ·

The Purchaser here sued for $198,000 in damages for breach of contract, contending that the Sellers had failed to deliver the real property it contracted to purchase in the condition it was in when the parties contracted. The Purchaser also sued on a negligence theory for waste, alleging that after the parties contracted, the Sellers negligently allowed the property to deteriorate beyond ordinary wear and tear. According to the Purchaser, the damages resulted from repairs to the roof made by the city prior to settlement because the Sellers had failed to make the repairs after being cited for violations of the housing code. The Sellers defended on the ground that they contracted to sell the property "as is" without any warranties as to the condition of the property.

The rights and responsibilities of the parties for the repairs are governed here by their contract which included at least two written addenda. There was evidence in the record that the parties added to their preprinted contract a provision that

> [t]he property is to be sold in "as is" condition and Seller makes no warranty or representation as to the condition of the property, the improvements thereon or any of the components thereof.

This court has held that such a clause relieves a seller of any obligation to remedy housing code violations which exist before settlement, even though a preprinted clause specifies otherwise. *Craven v. Elmo,* 442 A.2d 526, 528 (D.C.1982). If there is a bar to the Purchaser's recovery under this condition, it is because the parties agreed to that condition.

The term "as is" means generally "that the buyer is purchasing property in its present state or condition." *Olmsted v. Mulder*, 72 Wash.App. 169, 863 P.2d 1355, 1359 (Div. 1 1993) (citations omitted); *see also Pelc v. Simmons*, 249 Ill.App.3d 852, 189 Ill.Dec. 353, 355, 620 N.E.2d 12, 14 (1993). Such provisions place the risk of loss on the purchaser.[1] *Varkell v. United States*, 167 Ct.Cl. 522, 334 F.2d 653, 655 (1964).

The trial court determined that the Purchaser was fully aware of the defects in the property on the date of the agreement and that it assumed the risk of loss associated with these defects. Therefore, it found against the Purchaser. The Purchaser has not appealed from the adverse judgment on its legal claims nor argued error in the trial court's legal ruling as an alternative basis for sustaining the judgment.[2] Therefore, whether the trial court erred in ruling on the Purchaser's legal claims is not before us on this appeal. However, it is essential to examine the Purchaser's legal claims for an understanding of the adequacy or inadequacy of the legal remedies.

### The Escrow Fund

The parties contracted to place $82,000 of the proceeds from the sale into an escrow account with interest to be credited to the Sellers. The sum was to be held in escrow as indicated on two specific lines in the settlement statement that reflected "Roof Repair Escrow [-] $80,000 and Mechanics Lien Escrow [-] $2,000." According to the contract, the only condition under which the escrow agent could disburse the funds without the Sellers approval was "if a lien against the Property is recorded which creates a valid claim under the title insurance policies issued by Escrow Agent in connection with sale of the Property." Otherwise, disbursement required the approval of the Sellers and the Purchaser. The parties' rights to the escrow fund depend upon the interpretation of these provisions of the contract.[3] The trial court determined that the escrow account was intended "to cover the cost of any *assessment* arising from the replacement of the roof on the Hacienda Apartments then being performed by the District of Columbia." (Emphasis added.) Thus, it appears that the court interpreted the contract to mean that the funds were set aside only to discharge any lien which might be placed against the property in order for the Sellers to convey clear title, rather than to cover the cost of any repairs. In that case, the funds belonged to the Sellers under the terms of the contract. The fact that the parties obtained that for which they bargained under the contract is not, in itself, a basis for the intervention of equity.

### Conclusion

Since the Purchaser has a cause of action for money damages for breach of contract or negligent waste which could be pursued in a

---

1. Even though the risk of loss for deterioration of the property caused by ordinary wear and tear may be on the purchaser, it has been held that "if the seller causes the damage by acts of waste or by negligence in caring for the property, the usual placement of risk of loss on the purchaser does not apply." RICHARD R. POWELL & PATRICK J. ROHAN, POWELL ON REAL PROPERTY § 881 [2], 81–111 (1995); *Northwest Kansas Area Vocational–Technical Sch. v. Wolf*, 6 Kan.App.2d 817, 635 P.2d 1268, 1270 (1981). In light of these considerations, it is doubtful that by inserting an "as is" clause in the contract, a seller can destroy or materially worsen the condition of the property after its execution, through its own fault, without being liable for resulting damages. However, absent the Purchaser's proof of such circumstances, it would not be entitled to prevail on its legal claim under this exception.

2. *See Group Health Ass'n, Inc. v. Reyes*, 672 A.2d 74, 75 n. 1 (D.C.1996); *but see Nationwide Ins.* *Co. v. United States Fidelity & Guar. Co.*, 304 A.2d 283, 285 n. 5 (D.C.1973).

3. We review a contract for ambiguity, "giving [the] language its plain meaning, without reference to any rules of construction." *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C.1990) (citation and internal quotations marks omitted). Where the terms are in dispute, this court must "determin[e] what a reasonable person in the position of the parties would have thought the disputed language meant." *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C.1982). This determination requires consideration of the circumstances surrounding the making of the contract, usages which the parties know or have reason to know, and the intent of the parties entering the agreement. *Id.* If the terms are still not susceptible to one definite meaning, remaining ambiguities will be interpreted strongly against the drafter. *Id.* (citations omitted).

suit at law, equitable remedies are not available. *See Marshall, supra,* 458 A.2d at 29; *Chavin, supra,* 246 A.2d at 922. That it was unsuccessful in proving its legal claims, either because of insufficiency of the evidence or a legitimate defense based on the terms of the contract, does not entitle the Purchaser to demand equitable relief.[4] *See Marshall,* 458 A.2d at 29. Since the Sellers are entitled to the money under the contract, as interpreted by the trial court, there would be no inequity in their retaining it.[5] Under these circumstances, the Sellers do not withhold unfairly funds from the Purchaser, thereby warranting equitable intervention to prevent unjust enrichment. *See Gray v. Gray,* 412 A.2d 1208, 1210–11 (D.C.1980). For the foregoing reasons, I respectfully dissent from the opinion of the court.

---

**4.** The Purchaser also would have to prove damages. The law seeks to place the injured party in the same position as if there had been no breach, not in a better position. *Fleming v. Twine,* 58 A.2d 498, 499–500 (D.C.1948).

**5.** This sum formed a part of the purchase price for the property. No doubt, the parties took into account the condition of the property in agreeing upon a price. They also addressed by written agreement the amount to be escrowed and the contingencies to be covered thereby.