IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CUSTOM AG SERVICE, INC., a Washington corporation, | ) ) ) | No. 32010-3-III |
| Appellant, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| LOREN AND JANE DOE WATTS, husband and wife, and their marital community, and DOUG AND JANE DOE WATTS, husband and wife, and their marital community, | ) ) ) ) ) ) ) | |
| Respondents. | ) | |

BROWN, A.C.J. – Seller Custom AG Service, Inc. (Custom AG) appeals the summary dismissal of its contract suit against brothers Loren and Doug Watts (Watts) who backed out of their auction bid to purchase Custom AG's farm land. Custom AG contends material facts remain in dispute regarding the extent of water rights included in the auction sale bearing on whether there was a meeting of the minds. We agree with Custom AG, and reverse the trial court's summary judgment grant.

FACTS

Because we are reviewing summary judgment, the facts are presented in the light most favorable to Custom AG as the nonmoving party. Custom AG placed up for

auction, through Musser Brothers auctioneers (Musser), seven parcels of Benton County farm land, totaling approximately 1,700 deeded acres and 174 acres of leased Department of Natural Resources land. Prior to the auction—in December 2011—Musser prepared a brochure distributed to potential buyers, including Watts.

The brochure described the water right for the property as follows:

> The irrigation for the property is through Water Permits from Washington State Department of Ecology and is identified as permit G4-24758P. The permit allows for usage from March 1 through November 1 annually for 1,100± acres.

Clerk's Papers (CP) at 74.

The brochure stated: "Each potential bidder is responsible for conducting, at their own risk, independent inspections, investigations, inquiries, and due diligence concerning the property." CP at 75.

The brochure also contained a section entitled "Disclaimer & Absence of Warranties," partly providing:

> ANNOUNCEMENTS MADE BY THE AUCTIONEERS AT THE AUCTION PODIUM DURING THE TIME OF THE SALE WILL TAKE PRECEDENCE OVER ANY PREVIOUSLY PRINTED MATERIAL OR ANY OTHER ORAL STATEMENTS MADE.
>
> The property is sold "AS IS-WHERE IS." No warranty or representation, either express or implied, or arising by operation of law concerning the property is made by Seller or the Auctioneers and are hereby expressly disclaimed. In no event shall Seller or the Auctioneers be liable for any consequential damages. The information provided is believed to be accurate but subject to verification by all parties relying on it. Seller and the Auctioneers assume no liability for its accuracy, errors or omissions. . . .
> . . . .
> Please arrive prior to the scheduled auction time to review any changes, corrections, or additions to the property information.

2

CP at 75.

Before the January 17, 2012 auction, it came to light that Musser's brochure inaccurately stated the water right information. In particular, the Department of Ecology (DOE) permit number was incorrect and the water right applied to fewer acres than described. On January 10, Custom AG's retained water consultant, Timothy Reierson, issued a memo to Custom AG representatives clarifying the correct permit number was G4-25953(A)P, with the water right limited to 825 acres—not 1,100 acres. The parties do not dispute that the corrected information was posted online prior to the auction, and the Reierson memo with the two DOE permits attached was included in a spiral notebook available at the auction, but apparently not separately sent in advance to Watts.

On auction day, Loren and Doug Watts each signed the Bidder Registration Terms & Conditions form, stating:

> I have read the terms and conditions of the auction and agree to be legally bound by them. These properties will be offered to the highest bidder(s) with the final price subject to Seller Approval. Lots will be offered separate, in any combination or as the entirety with bidding conducted in "rounds" until the highest price is achieved and the Auctioneer has exhausted all acceptable bids. Once a bid is made it may not be withdrawn until such time as you are outbid or the winner(s) declared.
>
> I understand a 4% (four percent) Buyers Premium will be added to the bid price.
>
> All property is sold AS-IS WHERE IS with no warranty expressed or implied except as to the merchantability of the title.
>
> Title will be transferred with Deed, subject to restrictions of record, free and

3

clear of any liens, back taxes, mortgages or encumbrances or as otherwise disclosed.

CP at 10.

Copies of the brochure, which still contained the above-mentioned errors regarding the water right, were placed on tables at the auction.

Loren Watts bid on parcels 1, 2, and 3. He was a successful bidder on parcels 1 and 3, for a total price of $3.5 million. Parcel 1 is 1,172 acres and parcel 3 is 125.5 acres.[1] The same day, Custom AG then prepared and signed a Real Estate Purchase Agreement (Agreement). Both Watts brothers refused to sign the Agreement or make the required $300,000 down payment.[2] Loren Watts stated in an affidavit that when he was presented with the paperwork to conclude the sale, he was informed that the property was "'short of water.'" CP at 33. He related he bid on parcels 1, 2, and 3 with the understanding that, as described in the brochure, the sale included prorated water rights for 1,100 acres and solely 914 acres of the property were under irrigation. He refused to sign the Agreement because it did not include the transfer of a prorated share of 1,100 acres of water rights. He believed the value difference was $1.1 million.

Both Watts brothers swore they reviewed the brochure prior to attending the auction, but were unaware of the Reierson memo or the two permits. Doug Watts swore he and his son had leased and farmed the property and that water was provided as part of the lease, but at no time was he informed the water right did not cover the

---

[1] Parcel 2 is 618.3 acres.

4

acreage actually irrigated and farmed. Loren Watts swore he was familiar with the property because Doug had leased and farmed it. The brothers denied they had been provided with information conflicting with the incorrect brochure statements.

Watts refused to complete the purchase and Custom AG ultimately sold the property to a third party. On October 24, 2012, Custom AG sued Watts for damages, alleging breach of their agreement to purchase parcels 1 and 3. Watts answered and claimed affirmative defenses including no meeting of the minds to support a contract, and misrepresentation of water rights by Custom AG and the auctioneer.

On August 26, 2013, Watts moved for summary judgment on the theories (1) there was no meeting of the minds because their bid contemplated a prorated water right for 1,100 acres, whereas Custom AG's acceptance of the bid was for a lesser 825-acre water right, (2) Custom AG's brochure and the Reierson memo with attached permits (perhaps distributed to some bidders but not to all) created confusion in the form of two understandings of what water right applied, and (3) Custom AG misled the bidders by the erroneous brochure and failure of the auctioneer to announce corrections from the podium. After hearing argument, the court entered an order granting Watts' motion for summary judgment and dismissing Custom AG's case. Custom AG appealed.

---

[2] The auction brochure specified a down payment schedule for each parcel,

ANALYSIS

The issue is whether the trial court erred in deciding no material facts remained in dispute and granting Watts' motion for summary judgment dismissing Custom AG's lawsuit as a matter of law.

We review an order granting summary judgment de novo and engage in the same inquiry as the trial court. *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 92, 993 P.2d 259 (2000). We will affirm summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. CR 56(c). We consider all facts and reasonable inferences in the light most favorable to the nonmoving party, and review questions of law de novo. *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). A defendant is entitled to summary judgment if the initial burden of showing absence of a material issue of fact is met and the plaintiff fails to make a factual showing sufficient to establish the existence of each essential element of the cause of action. *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624-25, 818 P.2d 156 (1991). A failure of proof as to an essential element of the plaintiff's case renders all other facts immaterial. *Id.* at 625.

An enforceable contract requires a meeting of the minds on the essential contractual elements. *Sea-Van Inves. v. Hamilton*, 125 Wn.2d 120, 126, 881 P.2d 1035 (1994). "The acceptance of an offer is always required to be identical with the offer, or there is no meeting of the minds and no contract." *Id.* (quoting *Blue Mt. Constr. Co. v.*

including $250,000 for Parcel 1 and $50,000 for Parcel 3.

6

*Grant County Sch. Dist.*, 49 Wn.2d 385, 688, 306 P.2d 209 (1957)). "Generally, a purported acceptance which changes the terms of the offer in any material respect operates only as a counteroffer, and does not consummate the contract." *Sea-Van Inves.*, 125 Wn.2d at 126. What constitutes a material variation depends upon the particular facts of each case. *Id.* Whether there is a meeting of the minds is determined by the objective manifestations of the parties, not on their subjective intent. *Hearst Commc'ns., Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). "Normally, the existence of mutual assent or meeting of the minds is a question of fact." *Sea-Van Investments*, 125 Wn.2d at 126.

The difference in the value of the prorated water right for 1,100 acres versus 825 acres is a material variation. Our question is whether, based upon applicable law, any genuine issue of material fact exists from which a trier of fact could hold Watts to an offer to purchase parcels 1 and 3 with a prorated 825-acre water right.

The owner of property offered for auction has the right, within reasonable limits, to prescribe the manner, conditions, and terms of sale. *Cont'l Can v. Commercial Waterway Dist. No. 1*, 56 Wn.2d 456, 459, 347 P.2d 887 (1959), *opinion adhered to on reh'g*, 56 Wn.2d 456, 354 P.2d 25 (1960)). The sale conditions may be incorporated in an advertisement of the auction; in such case, a reference thereto at the time and place of sale is a sufficient announcement of the terms and conditions of the sale. *Id.* "'Conditions prescribed by the seller or owner and announced at the time and place of the auction are binding on the purchaser whether or not he knew or heard of them.'" *Id.*

7

(quoting *Moore v. Berry*, 40 Tenn. App. 1, 288 S.W.2d 465, 468 (1955); *see*

RESTATEMENT (SECOND) OF CONTRACTS § 28 cmt. e (1981). The RESTATEMENT explains:

> [U]nless a contrary intention is manifested, bids at an auction embody
> terms made known by advertisement, posting or other publication of which
> bidders are or should be aware, as modified by any announcement made
> by the auctioneer when the goods are put up.

RESTATEMENT (SECOND) OF CONTRACTS § 28(2) (1981); *see Washburn v. Thomas*, 37

P.3d 465, 467 (Co. Ct. App. 2001). Once the auctioneer has accepted the bid in a

mode clear to the bidder, the sale is consummated; neither party can withdraw and the

auctioneer has no power to accept a higher or different bid. 1 CORBIN, *Contracts* § 4.14,

at 643 (rev. ed. 2003).

Custom AG's auction brochure conditioned the property was to be sold "as is-

where is," with an express disclaimer of any warranty or representation concerning the

property. Similarly, the Terms & Conditions form signed by Watts stated the property is

sold "AS IS-WHERE IS with no warranty expressed or implied except as to the

merchantability of the title." CP at 10. An "as is" clause generally means the buyer is

purchasing property in its present state or condition. *Olmstead v. Mulder*, 72 Wn. App.

169, 176, 863 P.2d 1355 (1993). When "an 'as is' clause is unambiguous: the seller

makes no warranties regarding the item sold. It is thus unnecessary to list warranties,

none of which are being made." *Warner v. Design & Build Homes, Inc.*, 128 Wn. App.

34, 41, 114 P.3d 664 (2005).

The brochure further provided the information is believed accurate but subject to

verification by all parties relying on it; and, the seller and auctioneers assumed no

8

liability for its accuracy, errors or omissions. The brochure warned each potential bidder is responsible for investigations, inquiries, and due diligence concerning the property. Such conditions operate to allocate risk of mistake to auction bidders. *See Rawson v. UMLIC VP, LLC*, 933 So.2d 1206, 1210-11 (Fla. Ct. App. 2006) (citing 27 RICHARD A. LORD, *Williston on Contracts* § 70:80, at 448 (2003)). Both Watts brothers admitted reading the brochure before the auction and are thus bound to knowledge of the disclaimer and exculpatory language.

The Watts nevertheless contend Custom AG's reliance on the "as is-where is" language is misplaced because it applies to either the condition of the property or to warranties. Watts asserts their refusal to sign the Agreement was based on the change in the water right, not on the condition of the property or a warranty related to the property. Watts argues Custom AG incorrectly attempts to extend the reach of "as is-where is" language to the description of the property and is at odds with the conduct of Custom AG and the auctioneer.

But the "as is-where is" and disclaimer provisions unambiguously specify the sole warranty concerning the property was merchantability of title. And Watts' reasoning ignores the brochure's risk allocation and due diligence provisions placing the onus on potential bidders (including Watts) to verify accuracy of the brochure information. Moreover, Watts did not dispute the spiral notebook with the corrected water right information was available online and at the auction. Watts was admittedly familiar with the bid property from previously farming it, with water provided under their lease.

9

As the *Rawson* court observed:

An underlying basis of most contracts . . . is that the buyer has had
ample time to consider the consequences and a full opportunity to engage
in due diligence as to the property being offered for sale. . . . The mistake
of risk can be placed foursquare on the shoulders of a party who has had the
opportunity to conduct the necessary due diligence, but has failed to do so.

*Rawson*, 933 So.2d at 1210 (quoting *Williston on Contracts* § 70:81, at 457)).

Similarly, Watts' arguments ignore that a water right is appurtenant to the

property when a permit has been granted and the water has been put to beneficial use.

*See Hanson Indus., Inc. v. Kutschkau*, 158 Wn. App. 278, 239 P.3d 267 (2010), *review*

*denied*, 171 Wn.2d 1011 (2011); RCW 90.03.380(1); chapter 90.44 RCW

(groundwater). Permits are a matter of public record. *Schuh v. Dep't of Ecology*, 100

Wn.2d 180, 185 n.1, 667 P.2d 64 (1983). The correct permit, No. G4-25953(A)P

specifying the water right of 825 acres was issued on January 25, 2008—well before the

current auction and was available to Watts. The brochure warned Watts was

"responsible for conducting, at their own risk, independent inspections, investigations,

inquiries and due diligence concerning the property" CP at 75. Significantly, the record

shows the spiral notebook was available to Watts at the auction, undermining Watts'

contention that their bid was a counter offer.

Given all, we agree with Custom AG that there are genuine issues of material

fact regarding the auction, what Watts knew (or should have known) about the land sold

(including the water right), and why they did not purchase the parcels. On our record, it

is for a trier of fact to determine knowledge attributable to Watts and whether Watts

10

should be held to its bids (offers) for parcels 1 and 3 with a prorated 825-acre water right. If so, a trier of fact could find that Custom AG's acceptance mirrored the offer and a contract was made. Watts's claims they were not aware nor could they have reasonably been aware of the 825-acre water right are matters of weight and credibility for the trier of fact to decide and are not appropriate for summary judgment. *See Barker v. Advanced Silicon Materials, LLC,* 131 Wn. App. 616, 624, 128 P.3d 633 (2006) (trial court does not weigh the evidence or assess witness credibility on a motion for summary judgment).

In sum, the trial court erred in granting summary judgment dismissal in favor of Watts because material fact questions remain in dispute. We note Watts raised statute of fraud (RCW 19.36.010) arguments for the first time at the trial court in their summary judgment rebuttal brief and does not argue the statute of frauds here, choosing instead to rely on their meeting of the minds contentions. A trial court may not grant summary judgment to the moving party on issues first raised on rebuttal. *Molloy v. City of Bellevue,* 71 Wn. App. 382, 385, 859 P.2d 613 (1993). While Custom AG addresses the statute of frauds in its opening brief, our record does not show the trial court's reliance on the statute of frauds. Considering *Molloy,* we presume the trial court did not rely on that theory. Moreover, the Watts' at the trial court and here have solely argued their meeting of the minds theory. Therefore, we do not address the statute of frauds.

No. 32010-3-III
*Custom AG Serv., Inc. v. Watts*

Reversed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Brown, A.C.J.

WE CONCUR:

Korsmo, J.

Lawrence-Berrey, J.

12